IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 20, 2004

**STATE OF TENNESSEE v. JAMES ALLEN BATES**

**Appeal from the Criminal Court for Sullivan County**
**Nos. S45, 667    Phyllis H. Miller, Judge**

_____

**No. E2003-01475-CCA-R3-CD**
**May 7, 2004**
_____

A jury convicted the Defendant, James A. Bates, of two counts of especially aggravated kidnapping, three counts of assault (which the trial court merged into a single count), one count of possession of a firearm by a convicted felon, one count of felony evading arrest, and one count of possession of marijuana. The trial court subsequently sentenced the Defendant on the especially aggravated kidnapping convictions as a Range II, multiple offender to an effective term of thirty-eight years in the Department of Correction. The Defendant now appeals, challenging the sufficiency of the evidence supporting his convictions of especially aggravated kidnapping and the trial court's decision to sentence him as a Range II, multiple offender on those offenses. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOE G. RILEY and THOMAS T. WOODALL, JJ., joined.

William A. Kennedy, Blountville, Tennessee, for the appellant, James Allen Bates.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; Greeley Wells, District Attorney General; and Robert Montgomery, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Amanda Herron, the victim in this case, testified that she was spending the night of August 27, 2001, with the Defendant in his trailer. While she had used illegal drugs in the past, she stated that she had not used any such substances on the day or night in question. When she went to bed at about eleven p.m., the Defendant was on the couch. When she got up some time later to go to the bathroom and get a drink of water, the Defendant was still on the couch, asleep. He had a beer in one hand and a pill bottle in the other. Ms. Herron went back to bed without disturbing the Defendant.

The next thing she knew, Ms. Herron awoke to the Defendant pulling her hair and yelling at her. She testified that the Defendant yelled, "Bitch, what did you do with my shit?" Ms. Herron assumed that the Defendant was referring to his drug of choice, Oxycontin, or money. Ms. Herron told the Defendant that she did not know what he was talking about, but he pulled her out of bed by her hair and into the hallway, all the while repeating his question. Ms. Herron testified that the Defendant was "very loud and angry" and that she had never seen him like that before. The Defendant took the victim into the living room, where she searched the couch for pills. She found none, and the Defendant dragged her into the bathroom, still holding her hair. The Defendant told the victim, who was wearing shorts, a tee-shirt, bra and panties, to strip so that he could search her. The victim removed her shirt, and the Defendant then removed her shorts and panties; he also searched under her bra. Finding no drugs in her clothes, the Defendant inserted his fingers into the victim's vagina and rectum. Still not finding what he was looking for, the Defendant produced a pistol and hit the victim's face with it.

The Defendant then made the victim lie down, and he tied her hands and feet. Ms. Herron testified that she was "very scared" and begged the Defendant to stop. After tying her up, the Defendant again struck the victim in the face with the gun. He then put the gun in her mouth and threatened to blow her brains out. He followed this action with placing the barrel of the gun in the victim's vagina, threatening to blow her guts out.

In order to escape the Defendant, Ms. Herron told him that she had put his stuff in her truck. When he left the trailer to go check, Ms. Herron managed to free her feet and jumped out of a window, knocking the screen out. She ran to the trailer next door and beat on the door with her elbow, screaming for help and for someone to call the police. While she was doing this, the Defendant came up behind her, grabbed her by her hair and dragged her back to his trailer. He struck her with the gun again and tied her hands and feet again. He then burned her with a cigarette and pinched her body in various places with a pair of pliers. Eventually, the Defendant became tired and lay down beside her, tying her to him and placing the gun on his chest. After he fell asleep, the victim was able to free herself sufficiently to escape. She ran to a nearby store, and the police were contacted. She was taken to the hospital and later photographed by Detective Penney Kendal.

Edna Smith testified that she lived in a trailer next to the Defendant's. She had met both the Defendant and the victim, but did not know either of them well. She testified that at about three a.m. on the night in question, she "heard a terrible racket come against the trailer." She got up and looked outside but did not see anyone. She testified that she did not hear any knocking or screaming. She did not go outside until about nine o'clock that morning, at which time she saw the Defendant with a window screen in his hand.

Det. Penney Kendal testified that she saw the victim at about eight o'clock in the morning on August 28, 2001. She described the victim as "very distraught, tired, scared." She described the victim's physical condition as follows:

> Her eyes were swollen, her eyelids were black and blue and purple, her lips
> . . . were great big swollen, protruding red, dried blood on them. She had a very large

and long deep tissue bruise across the right [arm], by the triceps and biceps, black, blue, very deep, long approximately two inches thick. She had ligature marks around both wrists. There was still a piece of some type of twine around one wrist. Her hands were swollen, red scratched, bloody. She had a burn mark on her arm. Just various nicks and bruises and fresh marks all up and down her arms. Her knees and legs were scraped up. One leg had a very long scrape, bloody abrasion. There [were] ligature marks around her ankles. Her feet and legs appeared swollen especially around the ligature marks. . . . [S]he had a few little pieces of hair missing. There were scratches on her buttocks, in the buttocks area, and there were some little pieces of skin, nicks and scratches on her back.

Det. Kendal testified that, when she visited the Defendant's trailer, she saw a bent screen half-way back in its window.

Detective David Cole also saw the victim that morning. He described the binding around her wrist as very tight, requiring that it be cut off. He executed a search warrant of the Defendant's trailer later that afternoon. There, he found in a garbage bag "various items of clothing and ropes and twine that [were] tied together." The couch cushions were scattered. He found a bra, pair of pants and shirt in a trash can in the kitchen. The bra had a thick shoestring knotted on it. Det. Cole found what appeared to be bloodstains on the bathroom floor, the bedroom doorknob and on a section of carpet. He took samples from each of these locations. When the Defendant was apprehended, he was carrying a pillowcase containing a loaded .22 revolver and several pills. Det. Cole later oversaw blood samples being drawn from both the Defendant and the victim.

Agent Kelvin Woodby of the TBI crime lab testified as an expert in DNA serology. He examined the samples taken from the bedroom doorknob and carpet and determined the presence of the victim's blood. He identified a mixture of DNA from the bathroom floor, of which the victim was a major contributor and the Defendant a possible contributor.

Agent Denise Buckner of the TBI identified the tablets found in the pillowcase as oxycodone and Zanax.

The Defendant recalled Det. Kendal, who testified that the victim had pending charges for attempt to commit aggravated robbery and robbery. She stated that the victim had confessed the robbery, a purse snatching, to her, and that she believed that the victim had been truthful to her about committing the crime.

Tanya Tunnell testified that she had known the Defendant and the victim for several years. She stated that she went by the Defendant's trailer at about two o'clock on the morning of August 28, 2001, and found the Defendant and victim both there. There was nothing wrong with the victim. Ms. Tussell stayed about thirty to forty-five minutes. She remembered the day because of the Defendant's arrest later that afternoon. Ms. Tussell stated that the Defendant "didn't do Oxycontins."

Rachel Cross testified that she had been friends with the victim, and did not know the Defendant. She stated that the victim told her in June 2002 that, with respect to her sexual preferences, the victim "liked to be tied up and held down." Ms. Cross also testified that the victim had told her that she had not actually been penetrated with the gun.

John McBee testified that he had had a sexual relationship with the victim in late 2001. He stated that, after they had been together about three weeks, they had been "getting ready to have sex," and the victim asked him if he would like to tie her up. He told her no, and she did not ask him about it again.

Upon hearing this proof, the jury returned a verdict of guilt on two charges of especially aggravated kidnapping accomplished with a deadly weapon. The Defendant now contends that the proof is not sufficient to support the jury's verdict on these offenses.[1]

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

Especially aggravated kidnapping is defined as false imprisonment accomplished with a deadly weapon. See Tenn. Code Ann. § 39-13-305(a)(1). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially

---

[1] The Defendant does not challenge on appeal the convictions he received for the other offenses.

with the other's liberty." Id. § 39-13-302(a). The Defendant contends that "the State did not prove that the [victim's] confinement was 'accomplished' with a deadly weapon." He argues that "[t]he confinement was accomplished with constraints, not the deadly weapon," and that "[t]he use of the gun was incidental to the confinement."

We are not persuaded. Prior to tying her up initially, which the Defendant obviously concedes having done, the Defendant beat the victim with the gun and brandished it in her face, terrorizing her with it. Because of the gun, the Defendant was able to tie the victim up without physical resistance on her part. Similarly, after the victim escaped the first time, the Defendant again beat her with the gun prior to again tying her up. We do not accept the Defendant's argument that the only way to accomplish false imprisonment with a deadly weapon is to threaten the victim with being shot if he or she tries to leave. This issue is without merit.

The Defendant also asserts that the evidence is not sufficient because the victim "is incredible." Because this Court does not make credibility assessments, this argument is misplaced. The jury obviously accredited the testimony of the victim and thus, this issue was resolved in favor of the State.

The evidence is more than sufficient to support the Defendant's convictions of two counts of especially aggravated kidnapping accomplished with a deadly weapon beyond a reasonable doubt. We affirm the trial court's judgments of conviction for these convictions.

The Defendant also challenges his sentence. Specifically, he contends that the trial court erred in determining him to be a Range II, multiple offender with respect to the two especially aggravated kidnapping convictions. Again, we disagree.

A "multiple offender" subject to Range II sentencing "is a defendant who has received . . . [a] minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes, where applicable." Tenn. Code Ann. § 40-35-106(a)(1). Here, the Defendant was convicted of especially aggravated kidnapping, a Class A felony. See id. § 39-13-305(b)(1). The Defendant has two previous convictions of rape, both offenses committed in 1988. Rapes committed prior to November 1, 1989, are considered Class B felonies. See id. § 40-35-118. However, both of these rapes were committed against the same victim during a single criminal episode. The record indicates that the Defendant first sexually penetrated the victim with his mouth and subsequently with his penis. The Criminal Sentencing Reform Act of 1989 provides that "Convictions for multiple felonies committed as part of a single course of conduct within twenty-four (24) hours, constitute one (1) conviction for the purpose of determining prior convictions; however, acts resulting in bodily injury or threatened bodily injury to the victim or victims shall not be construed to be a single course of conduct." Id. § 40-35-106(b)(4). The Defendant argues that the trial court erred in determining that his two rape convictions should be counted as two prior felonies rather than a single offense, for the purpose of determining his range of sentencing. The State contends that the trial court's ruling was correct.

In making its ruling, the trial court relied on the rape victim's testimony at the Defendant's guilty plea hearing in 1989. The victim was the Defendant's ex-wife. The victim testified as follows:

I was outside, I was watering the yard, and giving the dog water, and feeding him. I was getting ready to come to work. And I noticed a dark blue car that was coming up the driveway. It was a rather long driveway. And it pulled [up and] partially blocked my car in, and I saw who it was, that it was Mark Lightner; but I could not at that immediate point see that [the Defendant] was in the car. And then they got out of the car, Mark went over to [the Defendant's] car which was about fifteen feet from my little walkway there at the trailer; and [the Defendant] came over and stood a few feet away; and he said can I have a hug? And I said, no, I said, please, let's don't get started, and he said, please, he said, I've been in jail for two months, just give me a hug. And I said, okay, but that's all, and then, he hugged me, and I started to walk away. I went on into the house to get my stuff because I had to be at work at eleven o'clock; and it was around 10:30 by then. And he followed me in the house, and he said that he wanted the stereo back. And I said, okay, you can have the stereo, and I walked in my daughter's room, and picked it up, unhooked everything and I got it, and went back into the living room. And he asked where the guitar was, and I said that my son had it at my mother's house. He said that he wanted it, and he started trying to hug me again, and I said no, let's don't get started, stop right now, and he started getting, I could tell he was getting real mad. And he started pushing me back through towards the bedroom. He pushed me in there, and I screamed, I was scared. I was afraid of trying to restrain him or hitting him in any way because he had been violent to me before. And when I screamed, he told me that that was the biggest mistake that I ever made in my life. He pushed me down on the bed, and he alternately choked me with his hands. He pulled my hair, he hit me with both fists. He bit me on the hand. He twisted my arms, he bent my hand back until I thought it was going to break, he was trying to just make me say all kinds of things. He would say he loved me, and why couldn't we live together, why couldn't we make it work, and I'd say, this is the reason why, because of the violence, I can't take the violence. And then, he started undoing my pants then, and I said, no, stop it, stop right now. And he said, I've been in jail for two and a half months. And he started twisting my hair, and bending my hand back again, and then I finally, I was hurting so bad, I said, just do whatever you want to, and then, he unzipped my pants, and he ripped my underwear off, and threw them down. And then, he was holding me down, and he did oral sex on me. That lasted for a little while, and then, he climbed up on top of me. And then he did intercourse. I was crying the whole time. And then he made me get on top of him, and I was still crying the whole time. And he kept on and kept on, and then he got over on top of me and he finished, and then, he started getting violent again, asking me who had been in that bed since he was there. Wanting me, trying to force me to tell him who I had been with, or who I had slept with. And I was so scared at that point, the only thing I could do to try to get him to

-6-

calm down was to just say I love you; and that's when he finally calmed down, and he got up, and put his clothes on, and walked outside. And the only thing that I could keep in my mind to keep alive was to be just as quiet and calm as I could and just do whatever he wanted, or I was afraid that he would kill me.

The issue before us, then, is whether the two rapes perpetrated by the Defendant upon this victim should be construed as a "single course of conduct" such that they are merged into a single conviction for purposes of determining whether the Defendant is a multiple offender in the instant case.

As pointed out by the State in its brief, our supreme court has determined that multiple instances of sexual penetration upon a single victim during a single criminal episode are separate and distinct offenses for double jeopardy purposes. See State v. Phillips, 924 S.W.2d 662, 664-65 (Tenn. 1996). This is because each act of sexual penetration "is capable of producing its own attendant fear, humiliation, pain, and damage to the victim. Each type of penetration requires a purposeful act on the part of the perpetrator." Id. at 665. Here, the Defendant raped the victim twice: once with his mouth and subsequently with his penis. Each rape was accompanied by bodily injury and the threat of bodily injury. This Court has held that the exception to the twenty-four hour merger rule applies "when there is more than one previous act involving bodily injury or threatened bodily injury." State v. Horton, 880 S.W.2d 732, 736 (Tenn. Crim. App. 1994). We conclude that the Defendant's two separate rapes of his ex-wife constitute two separate acts for the purposes of the exception to the twenty-four hour merger rule. See also State v. John L. Goodwin, III, No. 01C01-9601-CR-00013, 1997 WL 409484, at *6 (Tenn. Crim. App., Nashville, July 23, 1997) (holding that the twenty-four hour merger rule did not apply to a single course of criminal conduct involving the rape and robbery of same victim because the rape involved bodily injury and the robbery involved the threat of bodily injury.) Accordingly, we find no error by the trial court in this regard. This issue is without merit.

We affirm the judgments of the trial court.

_____
DAVID H. WELLES, JUDGE